## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| B. NAGEL FILMS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>NETFLIX, INC. and LUMINANT MEDIA, INC.,<br><br>Defendants. | Case. No. 2:24-CV-09693-JKS-MAH<br><br>(Document Electronically Filed) |

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT WITH PREJUDICE

**FAEGRE DRINKER BIDDLE & REATH LLP**
Jeffrey S. Jacobson
600 Campus Drive
Florham Park, New Jersey 07932
Tel: (973) 549-7000
Fax: (973) 549-9381
jeffrey.jacobson@faegredrinker.com

**MITCHELL SILBERBERG & KNUPP LLP**
Robert H. Rotstein (*pro hac vice*)
Emily F. Evitt (*pro hac vice*)
2049 Century Park East, 18th Floor
Los Angeles, CA 90067-3120
Tel: (310) 312-2000
Fax: (310) 312-3100
rxr@msk.com
efe@msk.com

*Attorneys for Defendants Netflix, Inc. and Luminant Media, Inc.*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ......................................................................................... 1

II.     FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY ................. 2

      A.      The Parties' Documentaries. .............................................................. 2

      B.      The Order Granting Defendants' Motion to Dismiss. ......................... 4

      C.      Nagel's Amendments to the Complaint .............................................. 5

III.    LEGAL STANDARD ................................................................................. 6

IV.     ARGUMENT ............................................................................................... 8

      A.      The First Amended Complaint Pleads Few New Allegations. ............ 8

      B.      Plaintiff's Amendments Rely on Uncopyrightable Facts. ................. 10

      C.      Plaintiff's New Purported Similarities Are *Scènes à Faire* .............. 12

      D.      The Parties' Documentaries Lack Similar Total Concept and Feel ... 14

      E.      Further Amendment Cannot Save Nagel's Claim ............................. 15

V.      CONCLUSION .......................................................................................... 15

i

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                                                  **<u>Page(s)</u>**

*Althouse v. Warner Bros. Ent.*,
    No. CV 13-00696-RGK SSX, 2014 WL 2986939 (C.D. Cal. Apr. 28,
    2014) ...............................................................................................................12

*Baraka v. McGreevey*,
    481 F.3d 187 (3d Cir. 2007)............................................................................15

*Corbello v. Valli*,
    974 F.3d 965 (9th Cir. 2020)...........................................................................11

*Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)...........................................................................................7

*Hoehling v. Universal City Studios, Inc.*,
    618 F.2d 972 (2d Cir. 1980), *cert. denied*, 449 U.S. 841 (1980)......................13

*Hogan v. DC Comics*,
    48 F. Supp. 2d 298 (S.D.N.Y. 1999) ...............................................................12

*In re Rockefeller Ctr. Props. Sec. Litig.*,
    184 F.3d 280 (3d Cir. 1999)...............................................................................7

*Kay Berry, Inc. v. Taylor Gifts, Inc.*,
    421 F.3d 199 (3d Cir. 2005)...............................................................................6

*Moore v. Lightstorm Entm't*,
    992 F. Supp. 2d 543 (D. Md. 2014), *aff'd sub nom*. 586 F. App'x 143
    (4th Cir. 2014) .................................................................................................11

*Pimentel v. A&E Network Support/Hist. Channel*,
    No. 17-cv-13573, 2018 WL 10579549 (D.N.J. May 18, 2018) ........................10

*Pino v. Viacom, Inc.*,
    No. 07-3313, 2008 WL 704386 (D.N.J. Mar. 4, 2008).......................................9

*Piuggi v. Good for You Prods. LLC*,
    No. 23 Civ. 3665, 2024 WL 3274638 (S.D.N.Y. July 2, 2024) ........................13

## TABLE OF AUTHORITIES
<u>(continued)</u>

**<u>Page(s)</u>**

*Tanksley v. Daniels*,
    902 F.3d 165 (3d Cir. 2018).........................................................................7, 9, 13

*Troll Co. ApS, v. Russ Berrie & Co., Inc.*,
    290 F.3d 548 (3d Cir. 2002)......................................................................................7

*Whelan Assocs. Inc. v. Jaslow Dental Lab., Inc.*,
    797 F.2d 1222 (3d Cir. 1986)............................................................................7, 13

*Winstead v. Jackson*,
    No. 10-5783 (SRC), 2011 WL 4407450 (D.N.J. Sept. 20, 2011), *aff'd*,
    509 F. App'x 139 (3d Cir. 2013)..............................................................................7

**<u>Rules</u>**

Federal Rule of Civil Procedure 12(b)(6).............................................................1, 2

Defendants Netflix, Inc. and Luminant Media, Inc. ("Defendants") respectfully submit this Memorandum of Law in support of their motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the First Amended Complaint filed by Plaintiff B. Nagel Films, LLC ("Plaintiff" or "Nagel"), with prejudice.

## I.    INTRODUCTION

As this Court observed when dismissing Plaintiff's original Complaint, an "immovable" obstacle that Plaintiff encounters in its claim that Defendants infringed its documentary is that the works are largely "work[s] of fact, and facts … are not afforded copyright protection." Dkt. 25, p. 6. Plaintiff's First Amended Complaint ("FAC") has done nothing to change that conclusion, nor could it. Indeed, the FAC overwhelmingly repurposes allegations made in the original Complaint. The handful of purported similarities that Plaintiff does assert for the first time upon amendment relies entirely either on uncopyrightable facts or on *scènes à faire* that one might expect to see in such documentaries.

Plaintiff's ineffective attempt at pleading new allegations only underscores that further amendment could not save its lawsuit. The FAC should be dismissed with prejudice.

1

## II.    FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

### A.    <u>The Parties' Documentaries.</u>[1]

As described in further detail in the Memorandum in Support of Defendants'
Motion to Dismiss (Dkt. 11-2) (the "First MTD"),[2] Defendant Luminant Media,
Inc. ("Luminant") produced the documentary film *Scouts Honor: The Secret Files
of the Boy Scouts of America* ("Defendants' Documentary"). Luminant has
produced numerous successful and critically acclaimed motion picture and
television documentaries, including *The Internet's Own Boy: The Story of Aaron
Swartz* (2014), which was shortlisted for the 2015 Academy Award for best
documentary feature.

Defendant Netflix first streamed Defendants' Documentary on September 6,
2023. The work explores the history of the Boy Scouts of America's ("BSA")
knowledge and cover-up of child sexual abuse among troop leaders, as primarily

---

[1] To assist with the Court's review of the works, Defendants filed a copy of their
documentary alongside the First MTD. *See* Dkt. 11-3. Defendants also
simultaneously filed a letter with the Court that provided the credentials for an
Amazon account containing a copy of Nagel's Documentary (Dkt. 11-1).

[2] Defendants' First MTD (Dkt. 11-2) contains a detailed description of the events
and interviews covered by the parties' respective documentaries. As is appropriate
on a motion to dismiss under Rule 12(b)(6), this summary of factual allegations
comes from the face of the Complaint, material incorporated by reference therein
(including Defendants' Documentary), and other material that may be judicially
noticed. As set forth *infra*, the Court may consider these materials at the pleading
stage.

told from the perspective of (1) ten survivors of abuse; (2) Michael Johnson, a retired police detective and former BSA Director of Youth Protection who later became a whistleblower against the BSA; (3) journalist Patrick Boyle, who exposed the story of sexual abuse in the BSA and published a 1994 book titled *Scout's Honor* after obtaining BSA confidential files; (4) multiple plaintiffs' attorneys who sued the BSA; and (5) Steve McGowan, the former general counsel of the BSA.

Bruce Nagel is an attorney who filed a lawsuit against the BSA on behalf of three survivors. *Boy Scout's Honor* ("Nagel's Documentary"), produced by Plaintiff B. Nagel Films, LLC, was released on various streaming platforms on December 13, 2022. FAC ¶ 15. In stark contrast to Defendants' Documentary, Nagel's Documentary focuses on the stories of survivors who suffered abuse from a single perpetrator, Bill Sheehan—a scout leader and teacher in Foxborough, Massachusetts, and later in Fort Myers, Florida—and addresses the BSA sexual abuse scandal and cover-up as background and context for the Sheehan survivors' stories. Nagel's Documentary also primarily focuses on the story of a single survivor, Aaron Averhart. And Nagel's Documentary discusses Bruce Nagel's efforts to advocate for survivors through litigation against the BSA.

**B.**     <u>**The Order Granting Defendants' Motion to Dismiss.**</u>

Defendants moved to dismiss the Complaint on December 30, 2024, primarily on the basis that, as a matter of law, any claimed similarities between the two documentaries are based on uncopyrightable facts that are free for all creators to use; and that, in any event, the works are not substantially similar in protected expression.

On October 1, 2025, the Court granted Defendants' First MTD. In its order, the Court noted that, since the documentaries are works of fact, "nothing relating to the facts of the events that the films describe, the people they interview, and the settings they deal with can be protected by copyright law." Dkt. 25, p. 6 (citing *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, at 349-350 (1991)).

The Court also found that "[m]any of the expressive elements Plaintiff takes issue with are also not afforded copyright protection[,]" as such elements, including the use of "partial shadows, unnerving music, and stock footage of camping and scouting activities," all "fall under the unprotected category of *scènes à faire*." *Id.* Indeed, the Court highlighted that "[documentaries] feature three key components: archival footage, commentary, and interviews. These ingredients are crucial to the creation of any historically accurate film." *Id.* (quoting *Bouchat v. Balt. Ravens Ltd.*, 737 F.3d 932, 944 (4th Cir. 2013)). The Court further noted that, as to the films' dialogue, Plaintiff did not identify "more than the occasional use of

some of the same terms—something that is bound to happen in two documentaries dealing with the same scandal," which did not rise to the level of copyright infringement. *Id.* at p. 7. The Court gave Nagel an opportunity to amend the Complaint within thirty days of the entry of its order.

### C.    Nagel's Amendments to the Complaint.

Nagel filed the FAC on October 31, 2025. Dkt. 37. The FAC asserts twenty-nine purported substantial similarities between the parties' documentaries. ***Twenty-two*** of those purported similarities are the same as those that Nagel identified in its original Complaint or in its Opposition to the First MTD ("Nagel's Opposition") (Dkt. 18). Thus, only ***seven*** purported substantial similarities are new:

(i) abusers' threats to survivors' families;

(ii) survivors' struggles with mental health and suicide;

(iii) survivors' experiences of not being believed by their communities;

(iv) use of photographs of survivors as young boys in scouting uniforms;

(v) patriotic imagery, namely the imagery of the American flag, used to explore connections between scouting and patriotism;

(vi) imagery of churches used to explore connections between scouting and religion; and

(vii) imagery of newspapers regarding the abuse scandal.

A summary of the FAC's alleged "similarities," which shows the "similarities" that have been previously identified and highlights the new ones, is attached hereto as Appendix A.

## III.    LEGAL STANDARD

As this Court recognized in its order granting Defendants' First MTD, "[t]o establish a claim of copyright infringement, a plaintiff must establish: (1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work." *Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 203 (3d Cir. 2005) (quoting *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002)). To prove unauthorized copying, a plaintiff must show that the defendant (1) had access to the plaintiff's work, and (2) that the "the original and allegedly infringing works share substantial similarities." *Id.* For the purposes of this Motion only, Defendants assume (but do not concede) the access element,[3] because critically, even where access exists, a plaintiff's claim

---

[3] While not relevant to this Motion, there is no access here. Plaintiffs' purported substantial similarities were all present in earlier versions of Defendants' Documentary that predate any possible access to Nagel's Documentary. This prior independent creation would eviscerate any claim of access. Moreover, Defendants' Documentary is an offshoot of Luminant principal Brian Knappenberger's 2020 documentary *Church and the Fourth Estate*, which pre-dated Nagel's Documentary. That work related specifically to the BSA abuse scandal, with more emphasis on how the BSA, along with powerful figures in the Mormon Church, undertook efforts to stop the press from reporting on it. In any event, for the reasons discussed in this Motion, the Court should not need to reach these issues.

fails at the pleading stage where the works are not substantially similar as a matter of law. *See, e.g.*, *Winstead v. Jackson*, No. 10-5783 (SRC), 2011 WL 4407450, at *2-3 (D.N.J. Sept. 20, 2011), *aff'd*, 509 F. App'x 139 (3d Cir. 2013) (no copyright infringement even where defendants conceded that they had access to the copyrighted work, as a lay observer would not find substantial similarity of protected elements between the two works).

A plaintiff claiming substantial similarity must demonstrate that those similarities are predicated on protectable elements of the original work. *Dam Things from Denmark, a/k/a Troll Co. ApS, v. Russ Berrie & Co., Inc.*, 290 F.3d 548, 562 (3d Cir. 2002). Ideas and facts are not protectable elements of an original work. *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, at 349-350 (1991). Nor are *scènes à faire*, which are "incidents, characters or settings which are as a practical matter indispensable in the treatment of a given topic." *Whelan Assocs. Inc. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1236 (3d Cir. 1986).

When ruling on a motion to dismiss, a court may consider not only the plaintiff's allegations, but also documents that are incorporated by reference, integral to, or explicitly relied on in the complaint. *See, e.g.*, *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Applying this principle in a copyright infringement case, a court may review the respective works at issue. *See, e.g.*, *Tanksley v. Daniels*, 902 F.3d 165, 172 (3d Cir. 2018) (courts have justified

7

consideration of substantial similarity at the pleading stage by noting that "no discovery or fact-finding is typically necessary, because what is required is only a visual comparison of the works") (internal quotations omitted). Here, the Court has already dismissed Nagel's infringement claims once following its review of the works. Dkt. 25, 31. As the content of works has not, and cannot, change, the Court should find—again—that Nagel's claims have no plausible basis and dismiss them with prejudice.

## IV.    ARGUMENT

### A.    The First Amended Complaint Pleads Few New Allegations.

The FAC largely reiterates, ***often word-for-word***, a jumble of purported similarities that Nagel previously identified in the original Complaint. *See* Appendix A. For example, Nagel reiterates that both documentaries: explore the connection between scouting and organized religion; reference similar methods of abuse by Scoutmasters; use devices such as partial shadows and unnerving music; and discuss the impact of the BSA's bankruptcy settlement. Further, in discussing the works' sequences of events and pacing, Nagel repeats verbatim a line from its Opposition to the First MTD, stating that both documentaries "tell their stories by presenting interviews with sexual abuse survivors spliced with interviews with a journalist, attorneys, and others." *Compare* FAC ¶ 24(d) *with* Dkt. 18, p. 34.

In the first instance, such "'random similarities' are insufficient to establish substantial similarity." *Tanksley*, 902 F.3d at 177 (quoting *Williams v. Crichton*, 84 F.3d 581, 590 (2d Cir. 1996) (in turn quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984))). Thus, courts routinely reject theories of substantial similarity, like Nagel's here, based on random similarities scattered across works. *See Pino v. Viacom, Inc*., No. 07-3313, 2008 WL 704386, at *8 (D.N.J. Mar. 4, 2008) (lists of cherry-picked similarities are "inherently subjective and unreliable"), *citing Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045-46 (9th Cir. 1994).

Crucially, in assessing the sufficiency of the original Complaint, this Court did not find ***any*** of the aforementioned details sufficient to support a finding of substantial similarity. Indeed, and inexplicably, the FAC reiterates certain details that this Court specifically found to be unpersuasive, including the use of devices such as partial shadows, unnerving music, and stock footage of scouting activities. *See* Dkt. No. 25, p. 6; Appendix A.

Further, as detailed below, the few purported similarities that the FAC identifies for the first time fail to salvage Nagel's lawsuit. Nor do the few longer paragraphs that the FAC devotes to fleshing out purported similarities that Nagel has raised before, such as high-level similarities between the life stories of certain interviewees and the documentaries' discussion of religion. Each purported

9

similarity fails for the precise reasons supporting the dismissal of the original Complaint: such alleged similarities are either uncopyrightable facts or plainly constitute *scènes à faire*.

### B. Plaintiff's Amendments Rely on Uncopyrightable Facts.

The FAC identifies highly abstract, uncopyrightable alleged similarities between the life stories of certain individuals who are prominently featured in the two works, *i.e.*, the fact that those individuals participated in scouting as children and made efforts to "help" survivors as adults. FAC ¶ 21. The FAC also highlights the fact that both works discuss survivors' experiences during and after their abuse, including abusers threatening survivors' families and survivors' struggles with mental health and suicidal ideation. *Id.* ¶ 24(a), pp. 8-9.

Such elements are inherently uncopyrightable for the reasons the Court identified in dismissing the original Complaint: the life stories of real people, no matter how similar, are ***historical facts*** not subject to copyright protection, no matter how similar their lives are. As the Court noted, "facts … are not afforded copyright protection," and, therefore, "***nothing relating to the facts of the events that the films describe, the people they interview, and the settings they deal with can be protected by copyright law.***" Dkt. No. 25, p. 6 (citing *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, at 349-350 (1991)) (emphasis added); *see also Pimentel v. A&E Network Support/Hist. Channel*, No. 17-cv-13573, 2018 WL

10579549, at *3 (D.N.J. May 18, 2018) (historical and factual items are not copyrightable because of the "public benefit in encouraging the development of historical and biographical works and their public distribution"); *Corbello v. Valli*, 974 F.3d 965, 976 (9th Cir. 2020) ("Though the creative expression that is in [a work] … is protected by copyright, the assertedly historical elements are not."). In other words, neither the factual life stories of Bruce Nagel, Michael Johnson, or Steve McGowan (FAC ¶ 21), nor survivors' factual experiences with abusers' threats, mental health issues, or distrusting communities (FAC ¶ 24(a)), could constitute copyrightable elements.

Regardless, even if the Court were to compare these unprotected life stories, they are starkly *dis*similar. For example, Bruce Nagel is a lawyer who sued the BSA, whereas Michael Johnson is a former police officer and BSA Director of Youth Protection who later became a whistleblower against the BSA. And while Steve McGowan is an attorney, he is the former general counsel for the BSA who—in sharp contrast to Bruce Nagel—has lauded the BSA's efforts to stop child sexual abuse and downplayed its severity. The dissimilarities could not be plainer.[4]

---

[4] To reduce Nagel's assertion to its most absurd, Abraham Lincoln and Clarence Darrow were once both small-town Illinois lawyers noted for fighting on behalf of the oppressed. Yet, their life stories are hardly substantially similar. *Cf. Moore v. Lightstorm Entm't*, 992 F. Supp. 2d 543, 557 (D. Md. 2014), *aff'd sub nom.* 586 F. App'x 143 (4th Cir. 2014) ("[B]asic human traits that certain characters share, including age, sex and occupation, are too general or too common to deserve copyright protection") (internal citation omitted).

In sum, not only is the bulk of Nagel's additional allegations of "similarity" uncopyrightable, but they are also dissimilar. On this basis alone, the FAC should be dismissed.

### C.    **Plaintiff's New Purported Similarities Are *Scènes à Faire*.**

The FAC alleges for the first time that the works at issue are substantially similar because both purportedly contain stock or archival images of churches, the American flag, photographs of adult survivors as young scouts, and newspaper articles. Such common cinematic techniques are *scènes à faire* in a documentary about the BSA abuse scandal.

It is hardly surprising that both documentaries would depict the well-known (and factual) connection between scouting and organized religion and/or patriotism, and explore it via imagery of American flags and churches. The FAC also tries to make much hay of the fact that both documentaries generally explore "the widespread and deep connection in the United States between Scouting and religion." FAC ¶ 22. But there can be no monopoly on general allusions to religion. *Althouse v. Warner Bros. Ent.*, No. CV 13-00696-RGK SSX, 2014 WL 2986939, at *3 (C.D. Cal. Apr. 28, 2014) ("[A]llusions to Christianity in literature date back hundreds of years and are not generally protectible."); *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 313 (S.D.N.Y. 1999) (religious symbolism and biblical allusions are unprotectable ideas and themes). And, of course, the concept that certain

Scoutmasters have manipulated their positions both within the BSA and within religious organizations is unprotected historical fact. Nobody owns the fact that the BSA has been historically connected to religion and patriotism.

Nor is it surprising that documentaries about the BSA might feature interviews of former Scouts, and that photographs of their childhood experiences in scouting might be displayed. Such motifs are "as a practical matter indispensable in the treatment of [the] given topic[,]" and therefore are not protected by copyright. *Whelan*, 797 F.2d at 1236. *See Tanksley*, 902 F.3d at 175 (noting that "[i]n a film about a college fraternity, for example, 'parties, alcohol, co-eds, and wild behavior' would all be considered *scènes à faire*"); *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980) (holding scenes in a German beer hall and use of the German national anthem in works about the Hindenburg were unprotectable *scènes à faire*), *cert. denied*, 449 U.S. 841 (1980); *Piuggi v. Good for You Prods. LLC*, No. 23 Civ. 3665, 2024 WL 3274638, at *11 (S.D.N.Y. July 2, 2024) (documentary-style filming is not protected by copyright). Indeed, as this Court noted, archival footage is an ingredient "crucial to the creation of any historically accurate film." Dkt. 25, p. 6 (quoting *Bouchat*, 737 F.3d at 944).

13

### D.    <u>The Parties' Documentaries Lack Similar Total Concept and Feel.</u>

Finally, in asserting that the two works share a similar total concept and feel, the FAC reiterates, verbatim, the Opposition's argument that each documentary "reveals the story of sexual abuse in the BSA through a close up approach of abuse provided by the survivors, while gaining greater context through interviews with others discussing the abuse scandal in broader context." *Compare* FAC ¶ 24(e) *with* Dkt. 18, pp. 35-36. As this Court noted in dismissing the original Complaint, interviews and commentary are crucial to any historically accurate film and are therefore *scènes à faire*. Dkt. 25, p. 6 (quoting *Bouchat*, 737 F.3d at 944).

Without citing a single example, the FAC then goes on to state that Defendants' Documentary "copies [Plaintiff's] unique expression … including selection of facts, arrangement, mood and theme choices, stylistic techniques, carefully selected dialogue, music selection, and other copyrightable elements resulting a violation of Plaintiff's copyrighted work." FAC ¶ 24(e). As set forth more fully in Defendants' First MTD, none of these expressive elements could be considered remotely similar in the two documentaries (and if any such similarity existed, it does not relate to an element that is copyrightable). Dkt. 11-2, pp. 22-27. Further, as this Court noted with respect to similarity in dialogue, the two works do not involve "more than the occasional use of some of the same terms—something that is bound to happen in two documentaries dealing with the same scandal" and

that does not constitute the type of "sustained, extended similarity of language" that can trigger copyright protection. Dkt. 25, p. 7 (citing *Walker v. Kemp*, 587 F. Supp. 3d 232, 247 (E.D. Pa. 2022)). Nagel's conclusory list of purported similarities, unsupported by any concrete examples, is the quintessential sort of "unwarranted inference[], unsupported conclusion[], or legal conclusion[] disguised as factual allegation[]" that courts are not compelled to accept in evaluating a complaint's sufficiency. *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).

### E.    Further Amendment Cannot Save Nagel's Claim.

Even after receiving an opportunity to amend, Nagel still fails to plead any plausible theory whereby this Court could find that Defendants infringed any copyrightable element of Nagel's Documentary. Nagel's verbatim repetition of uncopyrightable elements that it unsuccessfully identified before, as well as its identification of new—and largely dissimilar—elements that plainly fall within the categories of uncopyrightable material that this Court previously found to be insufficient, confirm that Nagel cannot conceivably state a claim upon which relief can be granted. The FAC should be dismissed with prejudice.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their Motion and dismiss the First Amended Complaint with prejudice.

Dated: November 14, 2025          By:  *Jeffrey S. Jacobson*

Jeffrey S. Jacobson
FAEGRE DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, New Jersey 07932
Telephone: (973) 549-7000
Facsimile: (973) 549-9381
jeffrey.jacobson@faegredrinker.com

MITCHELL SILBERBERG & KNUPP LLP
Robert H. Rotstein (*pro hac vice*)
Emily F. Evitt (*pro hac vice*)
2049 Century Park East,18th Floor
Los Angeles, CA 90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100
rxr@msk.com
efe@msk.com

*Attorneys for Defendants Netflix, Inc. and Luminant Media, Inc.*

# APPENDIX A

| **APPENDIX A** | |
|---|---|
| **Purported Similarity Identified in FAC** | **Previous Reference** |
| Use of the "prism" of central narrators who were scouts as children and "attempted to help" survivors as adults (FAC ¶ 21) | Nagel's Opposition (Dkt. 18), pp. 1, 33 |
| Discussion of the connection between scouting and religion in the United States (FAC ¶ 22) | Nagel's Opposition (Dkt. 18), pp. 33-34 |
| Exploration of the BSA abuse scandal over the course of many decades and the BSA's attempt to cover up the same (FAC ¶ 24(a), p. 8) | Complaint (Dkt. 1) ¶ 20, p. 6; Nagel's Opposition (Dkt. 18), p. 31 |
| Use of interviews with survivors of abuse who are now adults, wherein survivors discuss their abuse in graphic detail (FAC ¶ 24(a), p. 8) | Complaint (Dkt. 1) ¶ 21, p. 9; Nagel's Opposition (Dkt. 18), pp. 31-32 |
| Survivors discuss how they hid the abuse they suffered (FAC ¶ 24(a), p. 8) | Nagel's Opposition (Dkt. 18), p. 32 |

| APPENDIX A | |
| --- | --- |
| **Purported Similarity Identified in FAC** | **Previous Reference** |
| Survivors discuss how the abuse made them question their sexuality (FAC ¶ 24(a), p. 8) | Nagel's Opposition (Dkt. 18), p. 32 |
| Survivors discuss how their abusers threatened their family members to ensure silence (FAC ¶ 24(a), p. 8) | Not previously identified as a purported similarity |
| Survivors discuss their struggles with mental health and suicide (FAC ¶ 24(a), p. 8) | Not previously identified as a purported similarity |
| Survivors discuss how abused boys would often not be believed, especially because the abusers were often viewed as pillars of the community (FAC ¶ 24(a), pp. 8-9) | Not previously identified as a purported similarity |
| Survivors Aaron Averhart and Doug Kennedy discuss similar forms of sexual abuse. The abuse is portrayed by | Complaint (Dkt. 1) ¶ 21, p. 9 |

| APPENDIX A | |
|---|---|
| **Purported Similarity Identified in FAC** | **Previous Reference** |
| cutting between the interview and stock footage of a campsite. Both survivors speak in a voiceover with unnerving music playing in the background. (FAC ¶ 24(a), p. 9) | |
| Averhart and other survivors discuss the positive elements of scouting and footage of campfire scenes plays as a voiceover references camping and cooking over open fires. The wholesome portrayal of scouting is abruptly ended by an interview discussing the abuse scandal. (FAC ¶ 24(a), pp. 9-10) | Complaint (Dkt. 1) ¶ 21, pp. 7-8 |
| Journalists are interviewed regarding the abuse scandal (FAC ¶ 24(a), p. 10) | Nagel's Opposition (Dkt. 18), p. 32 |

| APPENDIX A | |
|---|---|
| **Purported Similarity Identified in FAC** | **Previous Reference** |
| Attorneys familiar with the litigation against the BSA are interviewed regarding the abuse scandal (FAC ¶ 24(a), p. 10) | Nagel's Opposition (Dkt. 18), p. 32 |
| Discussion of the creation and failure of the Youth Protection Program (FAC ¶ 24(a), p. 10) | Nagel's Opposition (Dkt. 18), p. 32 |
| Discussion of the BSA's legal defenses (FAC ¶ 24(a), p. 10) | Nagel's Opposition (Dkt. 18), p. 33 |
| Discussion of the BSA's bankruptcy and settlement of claims (FAC ¶ 24(a), p. 10) | Complaint (Dkt. 1) ¶ 21, pp. 9-10 |
| Discussion of the BSA's concern with the tarnishing of its "brand" (FAC ¶ 24(b)) | Nagel's Opposition (Dkt. 18), p. 34 |

| **APPENDIX A** | |
|---|---|
| **Purported Similarity Identified in FAC** | **Previous Reference** |
| The theme of child sex abuse perpetuated by scoutmasters and others within the BSA, as well as the BSA's efforts to cover up the same, is explored through interviews of attorneys, experts, and survivors and their families (FAC ¶ 24(c), p. 11) | Nagel's Opposition (Dkt. 18), p. 35 |
| The connection between the abuse that survivors suffered as boys and their continued suffering is explored through the use of photographs of survivors as young boys in scouting uniforms (FAC ¶ 24(c), p. 11) | Not previously identified as a purported similarity |
| Use of somber and/or unnerving background music and stock footage of camping and scouting activities convey the contrast between the wholesome | Nagel's Opposition (Dkt. 18), p. 35 |

| APPENDIX A | |
|---|---|
| **Purported Similarity Identified in FAC** | **Previous Reference** |
| nature of scouting activities and the abuse pervading the BSA (FAC ¶ 24(c), pp. 11-12) | |
| Connection between scouting and patriotism is explored through patriotic imagery, including repeated showing of the American flag (FAC ¶ 24(c), p. 12) | Not previously identified as a purported similarity |
| Connection between scouting and religion is explored through imagery of churches (FAC ¶ 24(c), p. 12) | Not previously identified as a purported similarity |
| Use of images of newspaper articles regarding the abuse scandal (FAC ¶ 24(c), pp. 12-13) | Not previously identified as a purported similarity |
| Use of chiaroscuro lighting and partial shadows during discussion of the BSA's "perversion files" (FAC ¶ 24(c), p. 13) | Complaint (Dkt. 1) ¶ 21, p. 8; Nagel's Opposition (Dkt. 18), p. 35 |

| APPENDIX A | |
| --- | --- |
| **Purported Similarity Identified in FAC** | **Previous Reference** |
| Use of footage of out of focus hands flipping through files during discussion of the volume of the BSA's "perversion files" (FAC ¶ 24(c), p. 13) | Complaint (Dkt. 1) ¶ 21, p. 9 |
| Chilling and tense music used while survivors reveal the identity of their abusers. Additionally, footage of survivors in their present lives and their interviews is played as survivors discuss their abusers. (FAC ¶ 24(c), p. 13) | Complaint (Dkt. 1) ¶ 21, p. 10 |
| In the closing scene, white letters appear over a black screen while dramatic music plays. The words on the screen detail the BSA's bankruptcy settlement trust and the resulting uncertainty befalling survivors with | Complaint (Dkt. 1) ¶ 21, pp. 9-10 |

| APPENDIX A | |
|---|---|
| **Purported Similarity Identified in FAC** | **Previous Reference** |
| claims against the organization. (FAC ¶ 24(c), p.13) | |
| Interviews with survivors are spliced with interviews with journalists, attorneys, and others (FAC ¶ 24(d)) | Nagel's Opposition (Dkt. 18), p. 34 |
| A close up view of the abuse is shown through interviews with survivors, while greater context is provided through interviews with others discussing the broader effects of the abuse scandal (FAC ¶ 24(e)) | Nagel's Opposition (Dkt. 18), pp. 35-36 |